**FILED**
**OCTOBER 8, 2024**
**In the Office of the Clerk of Court**
**WA State Court of Appeals, Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 39038-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOEL ALLEN HANSON, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

COONEY, J. — Joel Hanson was convicted of first degree murder and unlawful possession of a firearm after he shot and killed Anthony St. John.

Mr. Hanson appeals, arguing that: (1) the trial court erred by refusing to give a self-defense jury instruction based on WPIC[1] 16.03, (2) that his trial counsel was ineffective for failing to request a jury instruction that he did not have a duty to retreat, (3) that cumulative errors deprived him of a fair trial, and (4) that the trial court improperly ordered him to pay the victim penalty assessment (VPA). In a statement of

---

[1] 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS—CRIMINAL (5TH ED.)

additional grounds for review (SAG), Mr. Hanson alleges his trial counsel was ineffective for allowing his video recorded statements to be admitted and in not requesting that the firearm enhancement run concurrent with his sentence for first degree murder.

We affirm Mr. Hanson's convictions and sentences and remand for the limited purpose of striking the VPA from the judgment and sentence.

## BACKGROUND

Mr. Hanson and Mr. St. John first met when Mr. Hanson drove to Yakima, Washington, to "get drugs." Rep. of Proc. (RP) at 1260. The two were reintroduced to each other by a mutual friend, Andrea Ammons, in early April 2020. Mr. Hanson was attempting to sell his Dodge Durango and find a roommate to share his apartment with in Ellensburg, Washington. Mr. St. John offered to purchase the Durango and pay half of Mr. Hanson's rent as his roommate. Mr. Hanson considered this a "be-all/win-all situation" and agreed to both offers. RP at 1262.

Mr. St. John "brought in a bag of guns" as "collateral" so he could take the Durango for a test drive prior to purchase. RP at 1264. Mr. St. John failed to return from the test drive for two days. When he returned, Mr. Hanson told Mr. St. John that both deals were off. Mr. St. John responded by "beat[ing] the crap" out of Mr. Hanson and "robb[ing]" him of all his money and everything he had in his pockets, including his apartment keys. Mr. St. John then took the guns he had given Mr. Hanson as collateral and departed in the Durango.

2

Mr. St. John returned to the apartment periodically, as if he resided there, and "would take all of [Mr. Hanson's] stuff again." RP at 1266. On these visits, Mr. St. John often possessed guns and would display them as if to threaten Mr. Hanson. Mr. Hanson alleged that Mr. St. John fired a shot "right past my face" on one occasion. RP at 1269.

On April 7, 2020, video cameras at a gas station in Selah, Washington, recorded Mr. St. John driving the Durango with Mr. Hanson in the passenger seat. After the duo entered the convenience store, Mr. Hanson withdrew funds from an ATM[2] and used his debit card to purchase items for Mr. St. John. The two did not appear to be in any "altercation." RP at 565. However, Mr. Hanson testified he was there against his will.

Later that same day, the two were again captured on a video camera depositing a check at an ATM and "fist bump[ing]" when the check cleared. RP at 1432-33. Again, Mr. Hanson testified he only went to the bank with Mr. St. John because he was scared. After leaving the bank and arriving back at his apartment, Mr. Hanson took the shotgun Mr. St. John had with him.

On another occasion, Mr. St. John was seen at the bank using Mr. Hanson's debit card to withdraw money from Mr. Hanson's account without his permission. Mr. St. John also attempted to wire $500 from Mr. Hanson's account, which Mr. Hanson disputed with his bank. The bank rejected Mr. Hanson's disputed transaction due to the

---

[2] Automated teller machine.

3

video recording of Mr. St. John accessing Mr. Hanson's account in Mr. Hanson's presence.

Mr. Hanson, angry about Mr. St. John using his account without permission, began to send text messages to other people about his plans to recoup his money. He sent a text message to Erin Kelso, stating, "I got the shotty back. I'm about to get some ammo and go handle him and [Ms. Ammons]." RP at 784-85. He also told her, "I need my truck back. I need my money. They stole, like, 600 bucks from me last night," and "[w]ill you beat the crap out of [Ms. Ammons] for me? I'll take care of the fucking [n—-er]." RP at 784-85. Mr. Hanson also text messaged a friend named Brandy: "I'm tired of this motherfucker. I need info and I need ammo, 20-gauge shells." RP at 789-90.

Mr. Hanson then visited Ms. Ammons at the Super 8 Motel where she was residing and told her he was on his way to buy shotgun shells "to blow that fucking n[—-]er's head off," referring to Mr. St. John. RP at 522. Mr. Hanson then purchased ammunition for a 20-gauge shotgun.

On the night of April 8, 2020, Mr. Hanson let William Burnham into his apartment. Around the same time, Mr. St. John was driving the Durango to Ellensburg, accompanied by Elia Molina and Jesus Mata. Eboni Baxter, who was in a "romantic relationship" with Mr. St. John, testified she saw Mr. St. John that day, and he was worried about Mr. Hanson because he "was becoming like super paranoid" and "was

4

getting high a lot and had been up for a couple of days." RP at 655, 664. Ms. Baxter also

testified that Mr. St. John wanted to check on Mr. Hanson.

Mr. St. John, Ms. Molina, and Mr. Mata arrived at Mr. Hanson's Ellensburg

apartment at about 10:00 p.m. Ms. Molina and Mr. Mata remained in the Durango while

Mr. St. John walked up to the apartment alone and unarmed. Mr. St. John knocked on the

apartment door and was allowed entry by Mr. Burnham. Mr. Hanson testified that he

then grabbed the loaded shotgun he had taken from Mr. St. John the day prior and pointed

it at him:

> [MR. HANSON:] [Mr. Burnham] opened the door and let [Mr. St. John] in my house. And I—I was like, What the fuck? I went and grabbed the gun. And I go back in my bedroom door, and I look. And I see [Mr. Burnham] standing holding the door open, and [Mr. St. John] is talking to him.
> And I had—it wasn't a shell chambered. It was in the slide. And I cocked the gun. I stepped out and I showed him that there was shells in it. And I loaded it and I cocked the gun. And I told him, I was like, Don't move.
> I just panicked. I didn't know what to say. I didn't know what to do. I was standing there like froze. And he starts to laugh at me. He is just like, You're not going to shoot me. He is like, This is—this is—You're not willing to do all of that. You're not going to do that much time. And he just laughs and he turns around.
> He is, like: You're not going to pull the trigger. I will. Something like that. He said something like—and he runs out of my house. And I'm like, okay. And I didn't shoot him because he wasn't coming at me.

RP at 1296.

Ms. Molina testified that she saw Mr. St. John come "flying down the stairs" to the

parking lot and that he looked scared. RP at 442. Mr. Hanson followed Mr. St. John out

of the apartment, stood at the top of the stairs, and aimed the shotgun towards Mr. St. John who was located near the driver's side door of the Durango. She testified Mr. Hanson was yelling "that [Mr. St. John] had tooken his dad's car, his bank card, and tooken some money and stuff like that. Yelling that to [Mr. St. John] while he was running." RP at 444. Ms. Molina heard a gunshot and saw Mr. St. John fall between the front and rear driver's side doors of the Durango. Ms. Molina exited the vehicle to check on Mr. St. John, who was unresponsive. She fled the scene along with Mr. Burnham and Mr. Mata.

Police were called by other residents of the apartment complex. Shortly after he shot Mr. St. John, Mr. Hanson sent a message to Ms. Kelso stating, "I just shot a n[—-]er." RP at 786. Police arrived at the scene, and a lingering Mr. Hanson was detained and placed in a police vehicle. Other officers rendered aid to Mr. St. John who had clearly been shot in the head:

> [DEPUTY KYLIE ROMERO SWIFT:] [T]he subject was — basically, he was shot in the head. His skull was in several different pieces. I could feel that, just based upon holding his head. It was very shifty.
> So just imagine — I was trying to hold his head together as best as possible. If you could imagine several parts of your skull in different pieces . . . That's what it was like.

RP at 684-85. Mr. St. John later died at the hospital. The cause of death was a gunshot wound to the head.

6

Mr. Hanson was taken to the police station for an interview where he was provided his *Miranda*[3] rights.  Mr. Hanson cooperated with officers throughout the investigation.  Mr. Hanson was ultimately charged with murder in the first degree with a firearm enhancement and unlawful possession of a firearm in the second degree.[4]  The case proceeded to a jury trial.

At trial, Mr. Hanson maintained that he believed Mr. St. John was going to the Durango to retrieve a gun at the time of the shooting.  He also testified he did not mean to shoot Mr. St. John but intended to fire a warning shot instead.  However, Corporal Jason Brunk and Detective Ryan Shull testified that no weapons, aside from the shotgun Mr. Hanson used in the shooting, were found on Mr. St. John or in the Durango.

Before jury deliberations, defense counsel proposed a standard justifiable homicide instruction based on WPIC 16.02 and RCW 9A.16.050(1).  The State did not object to the inclusion of this instruction, which became jury instruction 22:

> It is a defense to a charge of murder and manslaughter that the homicide was justifiable as defined in this instruction.
> Homicide is justifiable when committed in the lawful defense of the slayer when.
> (1) the slayer reasonably believed that the person slain intended to commit a felony or to inflict death or great personal injury,

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[4] Mr. Hanson was also charged with robbery in the first degree with a firearm enhancement.  However, this charge was amended to robbery in the second degree and then later dismissed on defense counsel's motion.

(2) the slayer reasonably believed that there was imminent danger of such harm being accomplished, and

(3) the slayer employed such force and means as a reasonably prudent person would use under the same or similar conditions as they reasonably appeared to the slayer, taking into consideration all the facts and circumstances as they appeared to him, at the time of and prior to the incident.

The State has the burden of proving beyond a reasonable doubt that the homicide was not justifiable. If you find that the State has not proved the absence of this defense beyond a reasonable doubt, it will be your duty to return a verdict of not guilty.

Clerk's Papers (CP) at 68.

Defense counsel next requested another self-defense instruction based on

WPIC 16.03 and RCW 9A.16.050(2). This instruction would have become instruction 23

(proposed instruction 23):

It is a defense to a charge of murder or manslaughter that the homicide was justifiable as defined in this instruction.

Homicide is justifiable when committed in the actual resistance of an attempt to commit a felony upon the slayer or upon or in a dwelling or other place of abode in which the slayer is present.

The slayer may employ such force and means as a reasonably prudent person would use under the same or similar conditions as they reasonably appeared to the slayer, taking into consideration all the facts and circumstances as they appeared to him at the time and prior to the incident.

The State has the burden of proving beyond a reasonable doubt that the homicide was not justifiable. If you find that the State has not proved the absence of this defense beyond a reasonable doubt, it will be your duty to return a verdict of not guilty.

CP at 93. The State objected to the inclusion of this instruction.

The State contended that Mr. Hanson's theory of the case could be argued under

instruction 22, and that there was no basis to argue Mr. St. John was committing a felony

8

when he was killed. The State argued, "even under the most generous review of any of the defendant's version of events," the evidence showed Mr. St. John had entered Mr. Hanson's apartment with permission from Mr. Burnham, and Mr. St. John had fled to his vehicle when he was shot. RP at 1380-81. The State contended Mr. Hanson could "still argue what [he] thought the victim may have been doing. But I really don't think the evidence supports that the victim was in the process of committing a felony at the time." RP at 1382.

The court pointed out that "if [Mr. Hanson] believed [Mr. St. John] was going to commit the felony, I think the other [instruction] covers that. And then, otherwise, it's 'upon' or 'in.' He is not upon or in a dwelling at th[e] time [of the shooting]." RP at 1382. The defense responded:

> [DEFENSE COUNSEL]: Well, Judge, I would disagree that it wasn't upon a dwelling. He is right outside. And the testimony is that Mr. Hanson thought that he was getting a gun out of the car to, potentially, come back in and rob him.
> I take issue with the statement that the victim is lawfully in. Mr. Burnham did not live there. He did not have dominion or control of the place to let anybody in.
> THE COURT: Uh-huh.
> [DEFENSE COUNSEL]: . . . Just because somebody else lets you into a house that you don't own, rent, or have any control over, does not mean you're lawfully there.
> THE COURT: Right. But when Mr. Hanson tells him to leave, he does. Now, Mr. Hanson may have thought he was going to come right back. But ––
> [DEFENSE COUNSEL]: Correct.
> THE COURT: –– he does leave . . . .

RP at 1382-83. Defense counsel next contended there was "the ongoing felony that he is committing and taking the motor vehicle." RP at 1384. The court disagreed that any case law supported the proposition that you could shoot somebody "who is taking your car, for example, if they are driving away." RP at 1384.

Ultimately, the court declined to give proposed instruction 23:

> THE COURT: Yeah. The second is actual resistance of an attempt to commit a felony upon a [ ] slayer or upon or in a dwelling. It's not upon a vehicle. It has to be a felony upon the slayer or a felony upon or in a dwelling or place of abode.
> So, I don't think taking a motor vehicle works. I have to—I'm agreeing with the state on this one. I don't—I think everything that Mr. Hanson wants to argue can be argued specifically on the other jury instruction about committing a felony.

RP at 1385.

The jury found Mr. Hanson guilty of first degree murder and returned a special verdict finding Mr. Hanson was armed with a firearm during the commission of the crime. The jury additionally found Mr. Hanson guilty of unlawful possession of a firearm.

The court sentenced Mr. Hanson to 300 months of incarceration on the murder charge, plus an additional 60 months for the weapons enhancement. He was also sentenced to eight months for the second degree unlawful possession of a firearm charge to run concurrently to the total 360 months for the murder conviction and enhancement.

10

Although the trial court found Mr. Hanson to be indigent, it ordered him to pay the then

mandatory VPA.

Mr. Hanson timely appeals.

ANALYSIS

SELF-DEFENSE INSTRUCTION

Mr. Hanson argues he was deprived of his right to a fair trial when the court

rejected his proposed self-defense jury instruction on resisting a felony (proposed

instruction 23). We disagree.

"A defendant is entitled to have his [or her] theory of the case submitted to the

jury under appropriate instructions when the theory is supported by substantial evidence

in the record." *State v. Griffith*, 91 Wn.2d 572, 574, 589 P.2d 799 (1979). "Where a trial

court has refused to give a justifiable homicide or self-defense instruction, the standard of

review depends upon why the trial court did so." *State v. Brightman*, 155 Wn.2d 506,

519, 122 P.3d 150 (2005).

> If the trial court refused to give a self-defense instruction because it found
> no evidence supporting the defendant's subjective belief of imminent
> danger of great bodily harm, an issue of fact, the standard of review is
> abuse of discretion. If the trial court refused to give a self-defense
> instruction because it found no reasonable person in the defendant's shoes
> would have acted as the defendant acted, an issue of law, the standard of
> review is de novo.

*State v. Read*, 147 Wn.2d 238, 243, 53 P.3d 26 (2002).

11

Here, defense counsel requested the jury be instructed consistent with proposed instruction 23. In objecting to the proposed instruction, the State contended that Mr. Hanson's theory of the case could be argued under instruction 22, and there was no factual basis to support the argument that Mr. St. John was committing a felony when he was killed. To illustrate this point, the State pointed out that Mr. St. John was given permission to enter Mr. Hanson's apartment from Mr. Burnham, who was inside the apartment at the time, and that Mr. St. John was fleeing from Mr. Hanson when he was shot.

Defense counsel countered that Mr. St. John could have been unlawfully in the apartment, even if he was allowed entry by Mr. Burnham, and that Mr. Hanson thought Mr. St. John was returning to the Durango to retrieve a gun. Thus, it was the defense's position that the felony for which it was arguing Mr. St. John committed was "upon" Mr. Hanson's dwelling, and there was "the ongoing felony that he is committing and taking the motor vehicle." RP at 1383-84.

The court ultimately disagreed and declined to give proposed instruction 23 based on its finding that no felony was being committed against Mr. Hanson or his dwelling, and its conclusion of law that taking a vehicle was not a crime for which homicide was justifiable. Consequently, our review is de novo.

"The justifiable homicide defense applies only if the felony which was sought to be prevented threatens life or great bodily harm." *State v. Brenner*, 53 Wn. App. 367,

12

376, 768 P.2d 509 (1989), *overruled on other grounds by State v. Wentz*, 149 Wn.2d 342, 68 P.3d 282 (2003). In other words, "such a defense is appropriate only if the felony which was sought to be prevented was of a violent nature." *Griffith*, 91 Wn.2d at 576.

Mr. Hanson acknowledges the authorities which indicate the justifiable homicide defense is only appropriate when the felony in question was one of violence which threatened injury or loss of life. However, he argues that those authorities do not account for Mr. Hanson's unique situation in which he alleged Mr. St. John had committed repeated violent felonies against him, such as assault and robbery, which, in turn, influenced Mr. Hanson's behavior on the day of the shooting. Mr. Hanson's argument is unpersuasive.

Mr. Hanson did not produce evidence that Mr. St. John was engaged in a violent felony against Mr. Hanson when he was shot. In fact, Mr. Hanson testified that when he pointed the gun at Mr. St. John, Mr. St. John "laugh[ed]" and said, "You're not going to shoot me," before running out of Mr. Hanson's apartment. RP at 1296. Moreover, Mr. Hanson's argument that the felony was the theft of Mr. Hanson's vehicle before the trial court is similarly unpersuasive; the theft of a motor vehicle is not a violent felony.

Mr. Hanson also states that proposed instruction 23 "does not require a reasonable belief about an intent to commit a felony or a reasonable belief about the harm that will follow or a reasonable belief at all." Br. of Appellant at 27. Mr. Hanson argues that "[t]he resistance-to-felony instruction [ ] provides a higher burden for disproving self-

13

defense" than instruction 22 does. *Id.* However, he acknowledges that prior cases have held that, where WPIC 16.02 (instruction 22) is given, WPIC 16.03 (instruction 23) is "repetitious." *State v. Boisselle*, 3 Wn. App. 2d 266, 291, 415 P.3d 621 (2018), *overruled on other grounds*, 194 Wn.2d 1, 448 P.3d 19 (2019); *Brenner*, 53 Wn. App. at 376 ("[WPIC 16.02] allows self-defense in almost the same language [as WPIC 16.03]: when the slayer believes the decedent intends to inflict death or great personal injury. Therefore, we find that the instruction given [WPIC 16.02] allows Brenner to argue his theory of the case."). Moreover, both instructions contained language stating that, when analyzing whether such force and means used were that of a reasonably prudent person, all of the facts and circumstances "as they appeared to him, at the time of *and prior to* the incident" should be considered. *Compare* CP at 68 *with* CP at 93 (emphasis added). It is unclear how proposed instruction 23's burden for disproving self-defense was lower than instruction 22's.

Instruction 22 allowed Mr. Hanson to argue his theory of the case and, in any event, proposed instruction 23 was inapplicable because Mr. Hanson did not produce evidence that Mr. St. John was committing a violent felony against him.

INEFFECTIVE ASSISTANCE OF COUNSEL

Mr. Hanson argues his counsel was deficient for failing to request an instruction to the jury that Mr. Hanson had no duty to retreat. We disagree.

Defendants have a constitutionally guaranteed right to effective assistance of counsel. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *State v. Lopez*, 190 Wn.2d 104, 115, 410 P.3d 1117 (2018). A claim of ineffective assistance of counsel is an issue of constitutional magnitude that may be considered for the first time on appeal. *State v. Nichols*, 161 Wn.2d 1, 9, 162 P.3d 1122 (2007). Ineffective assistance of counsel claims are reviewed de novo. *State v. White*, 80 Wn. App. 406, 410, 907 P.2d 310 (1995).

The defendant, Mr. Hanson in this case, bears the burden of showing (1) that his counsel's performance "fell below an objective standard of reasonableness based on consideration of all the circumstances" and, if so, (2) that there is a reasonable probability that but for counsel's poor performance, the outcome of the proceedings would have been different. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). "If either element is [] not satisfied, the inquiry ends." *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).

A defendant alleging ineffective assistance of counsel bears the burden of showing deficient representation. *McFarland*, 127 Wn.2d at 335. In reviewing the record, there is a strong presumption that counsel's performance was reasonable. *Id.* The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the

alleged error and in light of all the circumstances. *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986). When counsel's conduct can be characterized as a legitimate trial strategy or tactic, their performance is not deficient. *Kyllo*, 166 Wn.2d at 863.

Even if we find that counsel's performance was deficient, a defendant must affirmatively prove prejudice. *State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987). This requires more than simply showing that "the errors had some conceivable effect on the outcome." *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). A defendant demonstrates prejudice by showing that the proceedings would have been different but for counsel's deficient representation. *McFarland*, 127 Wn.2d at 337.

Mr. Hanson argues his counsel was ineffective for failing to request a no duty to retreat instruction because there was a dispute about whether Mr. Hanson or Mr. St. John was the initial aggressor.

"The law is well settled that there is no duty to retreat when a person is assaulted in a place where he or she has a right to be." *State v. Redmond*, 150 Wn.2d 489, 493, 78 P.3d 1001 (2003). The no duty to retreat instruction should be given when sufficient evidence is presented to support it. *Id.* The instruction is inappropriate when there is no evidence that anyone other than the slayer was the first aggressor. *See State v. Benn*, 120

Wn.2d 631, 659, 845 P.2d 289 (1993); *State v. Riley*, 137 Wn.2d 904, 909, 976 P.2d 624 (1999).

Here, there was no evidence that anyone but Mr. Hanson was the first aggressor, and the instruction was therefore inappropriate. Mr. Hanson's own testimony at trial demonstrated that he was the first aggressor:

> [MR. HANSON]: I hear a knock. I go and look. I see [Mr. Burnham] open the door. I see the guy. Oh, my God.
> [DEFENSE COUNSEL]: Who did you see?
> [MR. HANSON]: *I grabbed the gun.*
> [DEFENSE COUNSEL]: Who did you see at the door?
> [MR. HANSON]: [Mr. Burnham] opened the door and let [Mr. St. John] in my house. And I—I was like, What the fuck? *I went and grabbed the gun.* And I go back in my bedroom door, and I look. And I see [Mr. Burnham] standing holding the door open, and [Mr. St. John] is talking to him. And I had—it wasn't a shell chambered. It was in the slide. *And I cocked the gun. I stepped out and I showed him that there was shells in it. And I loaded it and I cocked the gun. And I told him, I was like, Don't move.*

RP at 1295-96 (emphasis added).

Given Mr. Hanson's testimony at trial, there was no dispute regarding who was the first aggressor. Consequently, even if defense counsel had requested the instruction, it would not have been provided to the jury. Because counsel was not deficient, we need not analyze whether Mr. Hanson was prejudiced.

Mr. Hanson's trial counsel was not ineffective.

CUMULATIVE ERRORS

Mr. Hanson argues cumulative error deprived him of a fair trial. He points to his trial counsel's alleged deficient performance as well as the court's denial of his request to include the resisting a felony self-defense instruction. "Under the cumulative error doctrine, a defendant may be entitled to a new trial when cumulative errors produce a trial that is fundamentally unfair." *State v. Emery*, 174 Wn.2d 741, 766, 278 P.3d 653 (2012). Finding no error, Mr. Hanson's argument fails.

VICTIM PENALTY ASSESSMENT

Mr. Hanson argues that, due to a recent change in the law, we should remand to the trial court for it to strike the VPA. The State contends that we should remand because a defendant can move in the trial court to strike the VPA. We agree with Mr. Hanson and remand for the court to strike the VPA from the judgment and sentence.

Former RCW 7.68.035(1)(a) (2018) required a VPA be imposed on any individual found guilty of a crime in superior court. In April 2023, the legislature passed Engrossed Substitute House Bill 1169 (H.B. 1169), 68th Leg., Reg. Sess. (Wash. 2023), that amended RCW 7.68.035 to prohibit the imposition of the VPA on indigent defendants. RCW 7.68.035 (as amended); LAWS OF 2023, ch. 449, § 1. H.B. 1169 took effect on July 1, 2023. Amendments to statutes that impose costs upon convictions apply prospectively to cases pending on appeal. *See State v. Ramirez*, 191 Wn.2d 732, 748-49, 426 P.3d 714 (2018).

Mr. Hanson's case is pending on direct appeal, and he was found to be indigent by the trial court. Accordingly, remand for the trial court to strike the VPA is appropriate.

The State argues we should not remand because Mr. Hanson "may make a motion to the trial court for the requested relief at any time." Br. of Resp't at 45; RCW 7.68.035(5)(b) ("Upon motion by a defendant, the court shall waive any crime victim penalty assessment imposed prior to July 1, 2023, if . . . the person does not have the ability to pay the penalty assessment."). The State's argument is unpersuasive. Mr. Hanson's case is pending on direct appeal, and we may therefore remand to have the trial court strike the VPA.

STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW

ADDITIONAL GROUND 1

In his first SAG, Mr. Hanson argues he was afforded ineffective assistance of counsel because his counsel allowed a video of him to be played at trial where he openly told officers he shot Mr. St. John before he was read his *Miranda* rights. Because the video Mr. Hanson complains of is not included in the record before us, we cannot address the issue.

Prior to trial, the State, defense counsel, and the court discussed whether a CrR 3.5 hearing was necessary to ascertain the admissibility of some of Mr. Hanson's statements to law enforcement. Defense counsel stated it did not believe Mr. Hanson's statements were in response to police interrogation, though they were custodial. Defense counsel

recognized, "[l]aw enforcement was busy doing other stuff.  They had him in the car

because they didn't know what was going on.  They weren't questioning him.  He was

just telling them what happened, as far as my investigation shows."  RP at 369.  Thus,

defense counsel conceded that he could not preclude the State from using the video of

Mr. Hanson discussing the shooting with law enforcement.

The video(s) Mr. Hanson complains of were admitted as exhibit 196A.  However,

exhibit 196A was not designated as a part of the record on appeal.  The Rules of

Appellate Procedure require an appellant to provide a sufficient record to review the

issues raised on appeal.  RAP 9.2(b).  "An insufficient appellate record precludes review

of the alleged errors."  *Stiles v. Kearney*, 168 Wn. App. 250, 259, 277 P.3d 9 (2012).  We

cannot consider matters outside of the record on appeal.  *McFarland*, 127 Wn.2d at 335.

Mr. Hanson's recourse is to raise this issue in a personal restraint petition, not in a SAG.

*State v. Alvarado*, 164 Wn.2d 556, 569, 192 P.3d 345 (2008).

ADDITIONAL GROUND 2

In his second SAG claim, Mr. Hanson argues he was afforded ineffective

assistance of counsel because his trial counsel did not request that his 60-month weapon

enhancement run concurrent with his sentence for first degree murder.

At sentencing, Mr. Hanson's counsel requested that Mr. Hanson be sentenced to

250 months of confinement, the low end of the standard range, plus 60 months for the

20

weapon enhancement. Ultimately, the court sentenced Mr. Hanson to 300 months of incarceration, plus an additional 60 months for the weapons enhancement.

RCW 9.94A.533(3)(e) provides, "Notwithstanding any other provision of law, all firearm enhancements under this section are mandatory, shall be served in total confinement, *and shall run consecutively to all other sentencing provisions*, including other firearm or deadly weapon enhancements, for all offenses sentenced under this chapter." (Emphasis added.) This statutory language deprives the sentencing court of discretion to run a firearms enhancement concurrently with another sentence. *State v. Brown*, 13 Wn. App. 2d 288, 290-91, 466 P.3d 244 (2020); *State v. Brown*, 139 Wn.2d 20, 983 P.2d 608 (1999) *overruled in part by State v. Houston-Sconiers*, 188 Wn.2d 1, 391 P.3d 409 (2017) (overruling *Brown* with regard to juveniles only). Defense counsel was not deficient for failing to request that the court run Mr. Hanson's firearm enhancement concurrent with his sentence for first degree murder because any such request would have been denied.

## CONCLUSION

We affirm Mr. Hanson's convictions and sentences but remand for the limited purpose of striking the VPA from the judgment and sentence.

No. 39038-1-III
*State v. Hanson*


A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Cooney, J.

WE CONCUR:

_____
Fearing, J.

_____
Staab, A.C.J.